Mr. Gasso, we'll hear from you. Thank you, Judge Jolly. May it please the Court. The District Court inexplicably threw out a jury verdict after a week-long trial. It offered literally no explanation except vaguely citing the reasons that MAPEI stated in its kitchen sink post-verdict filings. Those reasons include legal issues the Court correctly rejected at summary judgment and that MAPEI failed to re-raise in its Rule 50a submission. And those reasons include factual sufficiency challenges that MAPEI has largely abandoned on appeal, presumably because they are indefensible. The jury's verdict established that MAPEI gauged an egregious misconduct, and there is no legal or factual grounds for disturbing that verdict. MAPEI's position on appeal directly misstates controlling circuit authority, and it flips the factual sufficiency challenge on its head. We believe the judgment should be reversed. The MAPEI's key first argument on appeal is that the whether a contract was formed for the purchase of 14 machines is a pure question of law. Of course, this Court's authority says exactly the opposite. It says a contract formation is typically a question of fact for the jury. The Court said that in its Crestridge opinion. MAPEI's contention relies on a concurrence in Crestridge that was incompatible with the majority's actual disposition. When you look at the facts in the record, it's absolutely clear that MAPEI and the plaintiffs had agreed to a contract for 14 machines. It was contingent on the first machine working. And the unambiguous language in the critical clause says unequivocally that if the first machine works as planned, MAPEI agrees and is committed to purchase the following machines. What evidence do we have that they agreed to that? Well, they did agree. It's not that they didn't. Well, I say you didn't, but what evidence was there that they did? Oh, that they contemplated a purchase of 14 machines? Yes. We outlined this extensively in our opening reply briefs, starting in August of 2006, going all the way through the operative quotation, which was solicited for contract specifics in June of 2007. The parties contemplated a trade of exclusive rights to this Aerovac machine in exchange for MAPEI committing to the purchase of multiple machines. And that was the consistent negotiations between the parties. It's captured in multiple e-mails, including critical e-mails in mid-May. And these are cited in a block quote in our reply brief because they're so important. And on May 14th, a high-ranking MAPEI official instructed the plaintiffs to submit an actual quote, a single document with the contract specifics that explains the tradeoff for the deal and said specifically that if the first machine works, you can put us down for two machines per quarter. And that's exactly what the plaintiffs did in the quotation. And in responding to that e-mail, they said, and I think this is critical, that the quotation will become the contract between the parties. Once that quotation was submitted, MAPEI, and this is undisputed in the record. To what effect does it have that the quotation that you submitted said that the price was ultimately to be determined by the main office? In other words, the price was not fixed in the quotation. No, Your Honor, I want to be clear on this. The price was absolutely fixed in the quotation. What did that mean, that it was subject to approval by someone other than those that were signing the contract? What it said, Your Honor, and this is on page 44 of a 54-page quotation, it was the third of a boilerplate list. It said that all offers and agreements are subject to the approval of the headquarters of Stelutti Kerr. Now, the quotation was submitted by the headquarters of Stelutti Kerr. This is a small company. It was submitted by one of the two key principals, and he submitted it again saying this quotation will become the contract between the parties. But even if you disagree with what I just said, after that quotation was submitted, MAPEI reported that it went through their capital expenditure process and had been fully approved. Those are the words that they heard and that they said to the plaintiffs. They didn't say that it was approved except for certain things or that there were any reservations. They said that the terms of the agreement were considered and approved. That was met with an order confirmation, which again then was stated in an e-mail providing this is the contract between the parties. And the order confirmation, it did have that same language about the headquarters' approval, but again was submitted by the headquarters. So I think that this is a question of fact for the jury. We don't have to show, again, that there might be some evidence somewhere that some juror might look at and wonder if this cast doubt on this. We have to show that the evidence in the record, just that any rational being could have heard it and concluded that this, in fact, was a contract between the parties. Sotomayor, what was the rationale of the district court on the JNOV? It was literally, it was just a bare bones. We defer to the reasons stated in MAPEI's briefs, which listed over a dozen issues, including issues that we said were waived without any effort to engage our waiver arguments, and issues that the court expressly rejected on summary judgment, citing binding controlling authority from the Fifth Circuit and the Texas Supreme Court. We think it's highly unlikely that the district court reversed its own legal rulings earlier in the case without saying a single word about it, especially when there were no changes in the law and no reason to think that anything had changed between the denial of summary judgment and the post-verdict filings. What we think happened is that the judge simply disagreed with the jury's verdict. And the reason we think that is in addition to granting JMAL, the judge also conditionally granted a new trial, saying that the jury's verdict was against a great weight of the evidence. So either the judge concluded that 14 or 15 post-verdict arguments, and I think this Court knows from seeing appellate briefs with 10 or 11 issues, it's pretty rare to have that much error in a single case, especially when the judge had first in a very considered analysis, this is the opinion on summary judgment, it's in the appendix, the record excerpts that we included, went through each of their arguments and rejected them squarely. Let me ask you if I understand the case correctly, that we look at basically three documents, and that is the quotation, the purchase order, and the confirmation of the purchase order. And we look at those documents and determine whether a contract existed for the offer that was initially made in the quotation. Is that basically the case? Not exactly, Your Honor. Okay, tell me where it is. This is why, under this Court's authority, when there's multiple extensive negotiations, and this is under the Texas UCC-2, you look at the entire course of conduct between the parties, because it's a fact issue. It's a fact issue for the jury. So it's not just those three documents. It's those documents plus the six to eight months of extensive negotiations between Mr. Leedy, Kerr. It doesn't seem to me that that cuts against you, that that argument would cut against you, because, I mean, it seems to me that the negotiations that followed the confirmation order began to unravel. I mean, the parties began to unravel and fight against each other and dispute what was said and what was going to be. No, Your Honor. And there's also a fourth document, too, that's critical that I'd like to mention before I answer that directly, which is, after the order confirmation saying this is the contract between the parties, MPAE responded with a revised purchase order to change the exchange rate, because you're dealing with euros and dollars. In doing that, they attached it to the same e-mail referencing the same order confirmation, which was labeled as the contract between the parties. So I think it's very hard to believe that anyone in this setting, if they really thought that wasn't the contract and they thought it was this bare-boned, two-page purchase order, that was the agreement, that they wouldn't have said something. But when the negotiations started to unravel, it wasn't right away. It was months and months later, after MPAE realized in a ruling that MPAE actually doesn't challenge on appeal, that they decided that they wanted a better deal. They wanted to pay for fewer machines. They wanted expansive exclusivity rights. And they wanted exclusivity rights for a longer period of time. And they tried to do that. And I guess it's indisputable, I don't know, but you can tell me, that MPAE could only order one machine at a time through a purchase order, or could order a machine only through a purchase order. Your Honor, MPAE orders machines through a purchase order, but it was committed to submit purchase orders through the contract. And that's why I'm saying, though, but you're saying that MPAE was committed that they could only buy one machine, or only buy a machine through a purchase order. They could only fulfill the contract if they got a purchase order, and you understood that. Well, no, no. And the purchase order had to be approved by someone in Italy or somewhere, and such approval never occurred with respect to anything beyond the first machine. No, Your Honor. And this is, again— Tell me why I'm wrong. I'll tell you why you're wrong. Under the contract, and there's evidence that, again, we block-quote this in our reply brief because it's so important, and this is responding directly to MPAE's key argument, which you've just articulated as well as anyone possibly could. The parties contemplated that after agreeing to a purchase of 14 machines, it was contingent on the first machine working. So every— But you said after agreeing. Where did they agree? They agreed in — if you look to the plain language of the exclusivity clause in the Quotation and the Order Confirmation, it says that if the first machine works, so it's— But isn't that an offer? Where was it accepted? It was accepted by saying that the quotation was fully approved, and it was accepted when they then issued the purchase order. Where did they say it was fully approved? I mean, I thought they came back with a purchase order and said, okay, we'll buy one. But they didn't come back and say, okay, we'll buy all 14. It seems to me the purchase order was only two pages, where you had sent a 50-page document to them, they responded with a two-page document. So does it say somewhere in that two-page document, we accept the 50-page agreement to buy all these other machines? Your Honor, it said in the e-mail exchanges between the parties when they called in and they said the CapEx— Are the e-mails part of the contract? The e-mails are the negotiations that are relevant, because this is a fact issue for the jury, and you're not bound to only look at those three or four documents. We're unaware of any authority in any court that says that. But again, the purchase order for two pages, it was this unadorned purchase order. Mappé's own CEO testified in language that we quote again in our opening brief and reply brief, that Mappé would not agree to a contract of this magnitude without additional detail in it. So Mappé's own CEO testified effectively there's no way the purchase order was in fact the agreement between the parties. But again, this is a fact issue for the jury. The jury had ample evidence, direct and circumstantial, that when you negotiate a deal, and the negotiations, again, these were detailed e-mail exchanges saying if the first machine works, and this is again why they expected a purchase order for one machine. It's not to me that your case begins to unravel if you go beyond those initial — if you go beyond the initial exchange of documents. And I don't know this at all, but I mean, just my impression of reading the briefs is that the best case that you would have is that you made the offer in the quotation and they fully complied with it in the sense that they sent a purchase order for one machine, which was the — without denying anything else that had been said. And then the confirmation order comes, it sets out the terms of the exclusivity agreement and the 13 machines that they are supposed to apply, and there's nothing said about that. And that's the contract. But I mean — but you — then you are going to all of the other facts that indicate to me that the situation unrivaled out there and would be more indicative of the fact that there was no contract. No, Your Honor, let me be clear first. I'm wrong again, but — No, no, you're not. I think that our point is that what you just articulated as looking at those exchange of those key documents could, in fact, support the jury's verdict for a contract. We don't need anything else. My point is that if you look at the surrounding evidence going up to the — that those critical moments where the meeting of the mines occurred and even the evidence immediately after it, it's consistent with our view of the contract but inconsistent with theirs. Is it indisputable that the — that the quotation went through the CAP approval, CAP asset approval, and was approved by Italy or wherever the headquarters was? It is. Okay. And so that's your argument, I mean, that they approved not just the one purchase order, but they approved — I mean, that your entire quotation was sent to them without their ever saying or denying anything, that it came back and they complied with it to the extent that they purchased one machine. I mean, that just seems to me — and then you sent the confirmation order that again said it, said — and there was no denial of it. It just seems to me that — Your Honor, I think you've articulated a very easy, straightforward way to reverse the district court and to affirm the jury's verdict, and we would fully appreciate an opinion that says that. Our simple — Yes, you would. Our point is just that if you look at the surrounding evidence that supports us — and this is a fact question — you construe all the evidence in the favor of upholding the jury verdict and you disregard the evidence that cut against it. And I think doing that, this becomes a very easy case. I see my time's winding down, so I just wanted to address very quickly the one satisfaction rule argument and the issue preclusion argument that McPay offers to undercut its tortious interference claim. Again, McPay does not contest on appeal. They've abandoned the argument that the jury lacked sufficient evidence to determine that McPay, in fact, engaged in bad conduct and tortiously interfered with Steliti Kerr's rights with Erodo. For one satisfaction, this Court has said unequivocally in GE Capital that it does not apply in a setting — I don't see how — you're saying that even if we rule in your favor that you had a contract for the purchase of 13 machines and you can hold them to it, you still have a claim for — for interference contract on the part of my pie interfering with your contract that you've been fully reimbursed for? We have not, Your Honor. And this is critical. There were two agreements that Steliti Kerr had with Erodo. One was to supply machines directly for McPay and their industry. The second was a general distribution agreement to supply machines in North America. McPay tortiously interfered with both agreements. There's never been any satisfaction for the general distribution agreement that they interfered with. It's a completely different agreement. And in addition to that, the arbitration award was limited to three machines, and the jury did not include those three machines in its damages award under the contract or tortious interference. So the one satisfactional concept is that you can't collect twice. You don't get a windfall. Here, they didn't collect twice. They collected for three machines from Erodo, and they collected for the remaining machines from McPay for its misconduct. I see my red light is on. Okay. You've saved some time for rebuttal, Mr. Gysin. We'll hear from Mr. Hawkins now, representing Maypay. Is that the way you pronounce it, Maypay? Maypay, Your Honor. Maypay. Maypay. Maypay. Maypay. May it please the court. There are multiple reasons why the district court was entirely correct to grant McPay judgment as a matter of law. On the contract claim, I'd like to highlight two primary independent grounds on which to affirm. The first is the UCC formation issue. The second is the authority issue that Judge Cummings identified. Either of these bases is sufficient to affirm. Now, we think the easiest and most straightforward approach is to hold that Maypay never made a binding contract to purchase 14 machines, and the court can decide that issue as a matter of law using a simple application of the UCC battle of the forms. Under the UCC, the key part of the analysis is determining which document is the offer. That's crucial because under 2.207, we know that the terms of the offer will trump the terms of the acceptance to the extent that the acceptance contains materially different terms. Now, the price quote that SK sent to Maypay contains a home office acceptance clause that Judge Jolly identified earlier, stating that, quote, all orders and agreements shall be subject to the acceptance and approval of Stolytiker's headquarters, end quote. That clause precludes the price quote from being an offer because it prevents any purported acceptance from forming a contract. As we know from the stand— But if the jury heard all of that, and that's a factual matter because it was submitted by the headquarters itself, and the jury could have said, found as a matter of fact, that was inoperable in this situation. I don't think that's correct, Your Honor, and I'll explain why. Courts have routinely held that home office acceptance clauses preclude a price quote from being an offer. We've cited a number of cases in our brief, including the Stanford— Do you have any that are, in fact, like this, where the headquarters itself and a principal of the corporation itself submitted the offer? Your Honor, I don't know that any of the cases specifically speak to this exact fact parameter. What I do know is that the home office acceptance clause speaks to, quote, the acceptance and approval of SK's headquarters. I don't think it's reasonable to think as a matter of law that simply getting a price quote— As a matter of fact here, though, I mean, why another jury question, really? Your Honor, we look at home office acceptance clauses from the recipient. We know from the restatement that we would look at what a reasonable recipient would think upon reading the home office acceptance clause, namely, as Section 26 sets out, it is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent. That's from the restatement that same themes are echoed in Stanwood and the cases that Crestridge relies on, including the Gulf States case and the Technographics case. I think for that reason, we can decide this is a matter of law. The only document in this case, Your Honor, that could be an offer is the purchase order. Now, LaPaix's purchase order contains the three elements that are necessary for it to be an offer. It specifies a quantity, it involves the sale of goods, and it is signed. The acceptance, of course, was SK's order confirmation. As I understand it, though, the quotation containing all of the terms that they wish to apply, that the jury found did apply, that the quotation went through all of the formalities that are required for a contract from MaPaix to ENA. That is, it was approved by headquarters and all that sort of thing. Your Honor, the price quote was indeed sent to the CapEx process, but the crucial point here, Your Honor, is that Mr. Stoluti was admonished multiple times throughout the negotiation process that the only indicator of what CapEx approved was the purchase order. In this case, as Your Honor correctly identified earlier, the purchase order was for only one machine, so there's no reasonable basis for Stoluti Kerr to conclude that MaPaix had approved the purchase of more than one machine. Wasn't that a little misleading on the part of your client that they didn't say, wait a minute, we're not agreeing to these other machines? Couldn't it have been assumed, well, it's okay, send us the first one, and not make it clear that they were not accepting the purchase of others led them to believe that you had agreed to the 50-page document when it was not made clear that now you're saying you did not agree to that? I don't think so, Judge Prado, for two reasons. The first reason is, as I indicated earlier, we made clear throughout the negotiation process that CapEx was the only way that these purchases could be approved, and the purchase order was the only reflection of what CapEx had approved. The second point, though, Your Honor, is that Mr. Stoluti told MaPaix that we could reject exclusivity via our purchase order. At Record on Appeal, page 11175, Mr. Stoluti noted, quote, if the guarantee for subsequent machines is not included in your P.O., then MaPaix shall not obtain exclusivity. What is the explanation for your silence when they made explicit the terms of the exclusivity agreement? You said nothing about it whenever you made your purchase order and complied with the one provision that they said you needed to purchase at one first before the others fell into line. And then whenever they sent the confirmation order again, you were there silent as a toon. Oh, Your Honor, there was no need, we think, to have explicitly told them that we don't want this exclusivity clause in there because we'd been so clear from the outset that the purchase order was the only indication as to what the CapEx process had approved. Of course, the CapEx process approved one machine for about a million dollars. Their understanding is that the CapEx approved a $14 million purchase. That's difficult to believe. Well, why wouldn't it be reasonable for them to assume that if you had submitted this through your CapEx process, the quotation, and it came back and you complied with the quotation to the extent that you were required to comply with it at that time, that they didn't have a contract with you based upon the quotation, especially when you come back and give them the confirmation, or they give you the confirmation, and you still don't say anything, you just let the thing ride, and at that point, they're in complete compliance, or you're in complete compliance with the initial quotation. Your Honor, I think it may not have been necessary to alert them explicitly to that because of what we told them throughout the negotiation process. The comments from Mark Schaefer, Alicia Vaughn, Richard Senechal, I've got a record on appeal sites, ROA 10416, ROA 11178, ROA 10420. When were those remarks made, after or before the confirmation of the three documents that we're talking about? Before the purchase order had been sent out, Your Honor. We explained the CapEx process, and of course, Mr. Stoluti confirmed during his cross-examination at trial, record on appeal 9409, 9397, and 9433, that he understood the CapEx process. The purchase order, is that really necessarily contrary to, or does the fact that you have to go through a purchase order every time necessarily negate the argument that they're making, that the fact that you ran the quotation through the purchase order of the cap to begin with indicates an acceptance of the contract as a whole, even though you're going to make each purchase on each machine on the basis of the purchase order? Well, Your Honor, I don't think it could be an acceptance of the price quote, because the price quote is not an offer, of course. The offer in this case is the purchase order, and that spells out the three necessary terms of these. They wouldn't agree to that. I'm sorry, Judge King? I don't think they would agree that the purchase order is the contract. They don't, Your Honor.  That's debated. Yes, Your Honor. That point is certainly in dispute, but I think that we have the better argument, and I'll explain why. But the price quote, I think, Judge King, cannot be the offer because of the home office acceptance clause that Judge Sholley alluded to earlier. Yeah, whose home office? S. Steluti. Steluti-Kerr's headquarters, exactly. So they send out a 50-page document, and they say, we have to have home office approval of what? Of any quotations, orders, and agreements are all subject to the acceptance and approval of Steluti-Kerr's headquarters. Okay, so then there comes back a purchase order. So that has to be accepted. So your theory, then, is that the purchase order is the offer. Now, they probably thought that Steluti-Kerr probably thought that their 50-page document was the offer, right? I'm not sure whether or not they thought that, Your Honor, but it would not have been reasonable for them to think that because of the home office acceptance clause. We know that a price quote cannot be an offer if it reserves the right to further confirmation or further assent to the person issuing the price quote. That's the Gulf States case, the technographics case that we spoke to earlier. Well, let's assume you put out this 50-page, they put out this 50-page document, and there comes back accepted. That would have been the offer and the acceptance. It would not, Your Honor, because the response that Your Honor hypothesizes there would not have formed a contract. Anything that they received in response to a price quote, even if it was a purported acceptance, could not have been an acceptance as a matter of law because there would have been one further step necessary to form a contract, and that would have been the, quote, acceptance and approval of Stolyti Kerr's headquarters. You're really digging in on that one. It's eerie and he's sticking with it. Your Honor, I think that that's a fair reading of the law. I look at the Stanwood case, which relied on SCAFE. Assuming that is your position, which you've clearly stated, does that mean that everything that ensued after all the facts that complicate the case immensely are really irrelevant to a determination as to whether a contract did or did not exist? Yes, I think that's right, Your Honor. Under the UCC, as the Court's analysis set out in Stanwood, also Tricon Energy, accessing the cases that we set on page 27 of our brief, the Court looks at these documents and concludes as a matter of law, which is the offer, which is the acceptance, and that determines the material alterations in the acceptance will drop out per UCC 2.207A, and of course, quantity is a per se material term. And so any change in quantity, such as that in the purported exclusivity clause, would drop out of the contract. There's an entirely... Why didn't you all make clear that you were not accepting, I mean, that's where the confusion is, which is, okay, we'll buy one, but it was not made clear there was no objection to the quotation. Why wasn't that done? It seems to me, okay, you agreed to buy 14, there was no, wait a minute, whoa, we didn't agree to this. Why wasn't that made clear? Your Honor, I took Judge Jolly to be asking a similar question earlier, and I think my best response is that throughout the negotiation process, in accordance with the record sites I provided earlier, we made clear throughout the process that the CAPEX-approved purchase order was the only indication of what the CAPEX process had approved. And of course, Anthony Stoliti himself, at Record on Appeal 11175, indicated that if the guarantee for subsequent machines is not included in the PO, the MAPE shall not obtain exclusivity. Now, is that the issue that the district judge requested special briefing on in the JMRO? It's not, Your Honor. What is the issue that he asked for briefing on? That's the authority issue, and that provides a separate and independent basis to affirm the judgment below. The authority issue that Judge Cummings identified is simply this. MAPE never authorized its agents to purchase more than one machine, and so there was no contract for more than one machine. Now, Stolitiker bears the burden of establishing authority. As we indicated earlier, the evidence shows that MAPE repeatedly reminded — Is that just another expression of the fact that you can — that a purchase order is required for every purchase that you make? Is that more or less the same thing? The authority issue is the same thing as that? I suppose so, Your Honor. The point is that Stolitiker was notified that the purchase order is the only indication of what's been approved by CAPEX. So when we've sent them a purchase order for one machine, the only inference that they can draw from that is that the CAPEX process has approved only one machine, not 14. But why wouldn't the — I don't see why the jury wouldn't be able to, within its province, determine that that is — as a general proposition, is true, but whenever you show that the quotation went through the CAPEX express people and it came back approved to the extent that the offer required it to comply, that is, the purchase order for one machine, to try out, that the CAPEX had generally approved the agreement, especially when you didn't say anything. Why couldn't a jury decide that? Because, Your Honor, Stolitiker did not put on evidence at any point that we had approved 14 machines. The only way they could put on evidence to prove that is — Well, they did put on evidence that you had approved it in the sense that they have showed that — have shown that the quotation went through the process that required such approval, and that it came back without any comment and no evidence of anything other than it had been accepted because you made the purchase order for the one machine that was required under the quotation offer. Your Honor, I think the evidence of trial was overwhelming that the CAPEX process was the only way to approve a purchase of this magnitude. The jury heard evidence on that. The jury saw no evidence that there was any agreement for 14 machines. And the jury ruled against you. Your Honor, and Judge Cummings concluded that the evidence that Stolitiker had put on was legally insufficient. But the judge against the jury, that's — on a question of fact, that's not a fair fight for the judge. Your Honor, I see that I've got limited time remaining, if I may talk briefly about the tortious — I'm sorry? We're not going to push you out the door. Thank you, Judge Jolly. I'd like to turn briefly to the tortious interference claim, and I'd like to point out that Stolitiker cannot recover for tortious interference for two reasons. First, it has already been fully compensated for any injury it suffered. And second, the contracts that it claims were interfered with were not contracts at all. I'd like to walk the Court through the analysis. Stolitiker is a standard middleman. It buys products from a manufacturer, marks them up, and sells them to the end user. That's his business model. Here, it formed a specific contract with Arodo that set out at Record on Appeal.602 by which it would buy these AeroVac machines from Arodo and sell them to Mapei. Now the arbitrator found that SK and Arodo formed a contract for four machines. That's at paragraph 186 of the Arbitration Award, and it references SK's purchase order number 5279.4. The arbitrator held in paragraph 124 that there was no agreement for 14 machines. There was only agreement for four. So when Arodo sold machine numbers 2, 3, and 4 directly to Mapei, it breached its exclusivity contract with Stolitiker, and the arbitrator awarded damages of a half million euros for that breach. Now, it's black-letter law in Texas that the measure of actual damages for tortious interference with contract is the same as the measure of damages for breach of the contract interfered with. That's the American National Petroleum case that we cite at page 49. The arbitrator said there was a contract for four machines. Arodo breached as to three of those machines. The damages were a half million euros. That set the full extent of the injury that SK suffered. And there's no dispute that SK has already made that full recovery. Arodo wrote a check, and Stolitiker has cashed it. It has not challenged the arbitration in court. It has not moved to vacate it. And in fact, Mr. Stolitiker testified at trial that he was, quote, fully satisfied with that Arbitration Award. That's recorded on Appeal.9325. On those facts, Your Honor, there's no basis to award a double recovery to Stolitiker here. Now, Stolitiker's position is that there were actually two different contracts with Arodo, and I'd like to explain why that's wrong. The first contract they speak to is a, what they call, the general, non-exclusive North American distributorship between Stolitiker and Arodo. Your Honor, the arbitrator declared that that was not a binding contract at all. It was simply, quote, a gentleman's agreement. This is at paragraph 53 of the Arbitration Award. The arbitrator said it, quote, has no binding character under Belgian law, and further said that there was no breach of that agreement. The arbitrator noted that as to that contract, quote, compliance cannot be forced by legal process. Now, the first element of a tortious interference claim is identifying a contract subject to that general, non-exclusive North American distributorship is not a contract per the arbitrator. Second, Stolitiker claims that it seeks damages on Machines 5 through 14. It acknowledges it's already been compensated for Machines 2 through 4, but it seeks damages on 5 through 14. But again, the arbitrator held under Belgian law that there was no contract for Machines 5 through 14. This is paragraph 124 of the Arbitration Award. So on that basis, Your Honor, Stolitiker cannot recover on either one of those agreements because they did not exist. There can be no tortious interference with a contract that doesn't exist, and they've been fully compensated for the only breach that they did suffer as to Machines 2 through 4. In closing, Your Honors, this is a straightforward case for affirmance. We have given the Court multiple bases on each claim to affirm, and any one of them is sufficient. The other side has to overcome every single one of these bases, and they cannot overcome any. We ask this Court to affirm.  Thank you, Mr. Hawkins. Mr. Gassi, you've saved some time for rebuttal. I'd like to start out with the notion that there was not a viable general distribution agreement. My friend, who's very able, but I think he's misread the Arbitration Award, it says very clearly what they rejected is that it was an exclusive right to distribute in North America. So they said there wasn't a breach of that agreement. I think the more important point, though, is that this argument was never raised at any point below. So aside from not raising it under Rule 50A or Rule 50B, it wasn't even pressed below. The case proceeded on the presumption, which was a correct presumption, despite raising lots of other objections, that there was, in fact, a valid distribution agreement, and it had, in fact, been tortiously interfered with. As for whether the plaintiffs were fully compensated, I think it's also clear that the arbitrator did not say that there was only rights to a 14-machine contract. It said that under strict Belgian damages law, and this is under Article 3 of the law of 27 July 1961, and it's very quirky, but under Belgian law, unless you have machines that are actually in production, those are the only machines you can be compensated for. Texas law is obviously very different. If you violate a contract and you agree to purchase 14 machines, there can be damages for all 14 machines. But this ignores, again, that the One Satisfaction Rule doesn't even apply in this context. It's a limited doctrine for joint tortfeasors. The tortious interference claim is not a joint conspiracy claim. It's a claim that Mappe tortiously interfered with Plaintiff's rights with Arroto by strong-arming Arroto to terminate both their distribution agreement and their specific agreement to supply machines for Mappe. So I don't think that for many reasons that works. As for issue preclusion, we have, I think, a very strong argument that non-mutual issue preclusion doesn't even apply to arbitration awards. Under the U.S. Supreme Court's recent case law, arbitration is very clearly a matter of contract between the parties, and parties only agree to arbitrate with each other. They don't agree to resolve disputes with strangers to the arbitration agreement, especially here where it would be so inequitable to apply those findings to a separate lawsuit after the defendant had a full and fair opportunity to litigate and is trying to cherry-pick the findings they like and ignore the findings they don't like. So I think that that resolves the tortious interference claim. The only other thing, I think the contract is very clear, but I'll just end with one final point, unless the Court has questions. For the Home Office Acceptance Clause, I don't think any reasonable person could possibly look at the e-mail that was sent with the order confirmation. This is on page 10609 of the record, and say, attaches the order confirmation and contract between the parties.  Litigated, I mean, presented to the jury in full and worked from beginning to end? Absolutely. From beginning to end, the jury had this, and this was a clear point throughout the trial. The jury rejected that as a basis for? No, the jury accepted that. The jury accepted that this was the contract between the parties. Well, they rejected the argument that applied in this case, I guess. In other words, the jury assumed your argument. Yes, I'm sorry, Your Honor. They rejected the idea that the Home Office Acceptance Clause had any bearing on this or that it was somehow unsatisfying, unless the Court has further questions. Mr. Hawkins said it was a pretty straightforward case. Do you agree? I heard that, and I thought, well, it's a lot of things. I don't think that would describe it. Again, my friend is a very able advocate, but I don't think we would say this is the most straightforward case that we've ever made. Thank you, Your Honor. Thank you very much. We'll call the next case of the day, and that's